693 F.2d 606
 Fed. Sec. L. Rep. P 99,005
W. Hamilton CRAWFORD, Lillian W. Crawford, Mack Hornbeck,
Dorothy C. Kimball, Plaintiffs-Appellees, Cross-Appellants,
v.
Kemmons WILSON, Defendant-Appellant, Cross-Appellee.
CRAWFORD CORPORATION, Plaintiff-Appellant,
v.
W. Hamilton CRAWFORD, Lillian W. Crawford, Defendants-Appellees.
Kemmons WILSON, Plaintiff-Appellant, Cross-Appellee,
v.
COVINGTON FUNDING COMPANY, Defendant-Appellee, Cross-Appellant.
 Nos. 81-5066, 81-5067.
 United States Court of Appeals,
Sixth Circuit.
 Argued Aug. 30, 1982.
Decided Nov. 24, 1982.
Rehearings Denied Jan. 4, 1983.
 
 David Wade, Martin, Tate, Morrow & Marston, Memphis, Tenn., for appellant, cross-appellee.
 Theodore Ness, New York City, Thomas F. Johnston, Gail O. Mathes, Armstrong, Allen, Braden, Goodman, McBride & Prewitt, Memphis, Tenn., for appellee, cross-appellant.
 Before LIVELY and MARTIN, Circuit Judges, and RUBIN,* District Judge.
 LIVELY, Circuit Judge.
 
 
 1
 This diversity action was begun by Hamilton Crawford and Lillian Crawford, husband and wife, (hereafter "Crawford," since Hamilton Crawford acted for both throughout the transaction which culminated in this lawsuit) filing suit against Kemmons Wilson (Wilson) to collect on two promissory notes in the aggregate principal amount of $2,206,319.05. In his answer and counter-claim Wilson pled fraud in the inducement by which he executed the notes and breach of warranties which entitled him to set-offs that reduced the amounts payable on the notes. The warranty and set-offs provisions on which Wilson relied were contained in a stock purchase agreement between him and Crawford. He asserted the same defenses against other parties to similar stock purchase agreements. Two of these parties (Mack Hornbeak and Dorothy Kimball) sued Wilson separately, and two corporate entities, Crawford Corporation (the Corporation) and Covington Funding Co., were either plaintiff or defendant in two other related actions. The five actions were consolidated for trial before the district court. A belated motion by Wilson for a jury trial was denied. All parties have appealed from the judgment of the district court, and the appeals were consolidated in this court for hearing and decision.
 
 I.
 A.
 
 2
 In an interlocutory order the district court succinctly and accurately stated the background of this lawsuit as follows:
 
 
 3
 Sometime in 1973, Kemmons Wilson entered into negotiations with W. Hamilton Crawford concerning the acquisition of the Crawford Corporation. During the course of those negotiations, Wilson received a letter from Crawford outlining the values of the assets of the Crawford Corporation and its subsidiaries. In addition, Crawford provided Wilson with the current financial statements establishing the book value of the corporation's stock. As a result of these negotiations, Wilson and Crawford executed a Stock Purchase Agreement on April 10, 1974, which provided that Wilson would purchase one-third of the Crawford Corporation stock owned by Crawford and his wife. The remaining two-thirds of the Crawfords' stock was purchased by the Crawford Corporation. As part of the consideration for their stock, the Crawfords received promissory notes from both Wilson and the Crawford Corporation. Similar transactions were utilized to purchase the Crawford Corporation stock owned by Dorothy Kimball and Mack Hornbeak. The stock acquisition was completed on May 7, 1974 at which time Kemmons Wilson assumed control of the Crawford Corporation.
 
 B.
 
 4
 Wilson was interested in purchasing Crawford's stock only if a way could be found for the Corporation to provide most of the necessary funds. Thus it was that A. Sam Gittlin, president of Covington Funding Co. of New York, proposed a plan by which Wilson agreed to purchase one-third of Crawford's stock with the understanding that the Corporation would make a tender offer for approximately two-thirds of the outstanding stock with cash on hand or to be generated by the sale of assets. By employing this device Wilson would eventually own a clear majority of the outstanding stock of the Corporation with a relatively small cash outlay.
 
 
 5
 During the negotiations between Crawford and Wilson and their agents it was always understood that the basis of any sale of Crawford Corporation stock would be its book value. Crawford originally asked $16 per share, which he supported in a letter to Wilson dated September 12, 1973. In the September 12 letter Crawford listed the audited book value of Corporation stock as of December 31, 1972 ($12.70 per share); the unaudited values as of July 31, 1973 and September 30, 1973 ($13.78 and $14.24 respectively); and the projected, unaudited value as of December 31, 1973 ($15.17). In the letter Crawford also estimated the future sales of assets of the Corporation consisting of unimproved real estate. He projected their sale at more than $12 million compared with a book value of about $4 million and an after-tax profit on sales of $4,296,735. Crawford also stated in the letter that an additional after-tax profit "of $3,000,000 to $4,000,000 should develop if all assets are built and sold." Wilson responded with an offer of $12 per share for all of Crawford's stock.
 
 C.
 
 6
 On April 10, 1974 Crawford and Wilson executed an agreement which embodied the Gittlin proposal for sale of one-third of the Crawford stock to Wilson to be followed by a tender offer from the Corporation for the purchase of two-thirds of the stock owned by each stockholder. Crawford agreed to accept the tender and sell to the Corporation all the Crawford stock which had not been purchased by Wilson. The purchase price for Crawford's stock was $14 per share. Wilson paid Crawford $50,000 in cash and gave the two non-negotiable notes which are the subject of this action for the remainder of the purchase price. The notes were due and payable three years after the closing date of the transaction and bore interest at the prime rate as defined in the agreement. They were secured by the stock of the Corporation purchased pursuant to the agreement and 50,000 shares of stock of Holiday Inns, Inc. owned by Wilson. The stock of other major shareholders, Hornbeak and Kimball, was acquired by Wilson under similar agreements. The transaction was closed on May 7, 1974.
 
 
 7
 The agreement provided in part 4, Conditions Subsequent to Closing, that the book value of all stock purchased by Wilson "shall be not less than $13.50 per share," after provision for taxes due and to become due. In part 5, Warranties, and Representations of Crawfords, Crawford made a number of warranties, including the following:
 
 
 8
 Crawfords have heretofore delivered to Wilson a consolidated balance sheet for Crawford Corporation and its subsidiaries, and a separate balance sheet for Crawford Corporation, Crawford Homes, Inc. and Crofton Corporation, all as of December 31, 1973, copies of which are attached hereto as Exhibit "C" and all hereinafter referred to as "Financial Statements." As of December 31, 1973, said Financial Statements were substantially true, complete and correct and were prepared in accordance with generally accepted accounting principles, consistently applied, and fairly represent the financial status of Company and each of its subsidiaries. There are no substantial liabilities, either fixed, or contingent, not reflected in such Financial Statements other than contracts or obligations in the usual course of business, and no such contracts or obligations in the usual course of business or liens or other liabilities, if disclosed, will alter substantially the financial conditions of Company as reflected by said Financial Statements.
 
 
 9
 Since December 31, 1973, there have not been, and prior to closing there will not be, any material changes in the financial position or assets of Company or Subsidiaries, except changes in the ordinary course of business and there have not been and shall not be prior to closing any payment of dividends or distribution in respect to capital stock except as set forth in Section 3 of this Agreement, nor shall there be any material increase in compensation payable to any of the officers, employees or agents of Company.*
 
 
 10
 It is understood that Company has contracts for the sale of certain of its real estate, said contracts being noted in Exhibit "D" hereto, which contracts shall be deemed in the ordinary course of business.
 
 D.
 
 11
 The principal contention by Wilson on appeal of error by the district court is based on that court's treatment of the provisions of the agreement relating to breach of warranty and the right of set-off. Since we have concluded that the proper interpretation and application of these provisions will furnish the key to the correct result in this appeal, we set forth parts 10 and 11 of the agreement in full:
 
 
 12
 10. Breach of Warranty.
 
 
 13
 (a) Prior to Closing. In the event any representation or warranty contained herein shall, prior to closing of this agreement, be determined to be untrue or breached, then the party to whom said warranty is made may in its sole discretion elect to cancel and rescind this agreement, and this agreement shall be null, void and of no effect, such election shall be made by giving written notice thereof to the other party, specifically describing the breach of warranty relied upon. In the event said party shall elect to proceed with the closing, then he shall not thereafter be entitled to rely upon such warranty or representation.
 
 
 14
 (b) Subsequent to Closing. The warranties and representations contained herein shall survive the closing and shall not be merged therein, provided however, no action shall be brought or claim made in respect to any warranty or representation unless the party taking such action or making such claim shall give notice in writing to the other party within three (3) years after the closing setting forth the nature of the breach of warranty or representation.
 
 
 15
 11. Indemnity and Set Off. In the event it shall be determined within three (3) years after the date of closing that there is a breach of warranty or misrepresentation contained herein, either on the date of execution hereof or the date of closing, and the cumulative effect of all such breaches of warranty or misrepresentations, including all expenses thereof, or in connection therewith when taken as a whole, if known on October 31, 1973, or on the date of closing, would have been to reduce the book value of the stock purchased hereunder by Wilson below the sum of $13.50 per share, then Crawfords do agree that upon demand, they will reimburse to Wilson, or Wilson may set off against any unpaid balance of the purchase price, a sum equal to the difference between said reduced book value and $13.50 per share.
 
 
 16
 In event the cumulative or combined effect of all such breaches of warranty and misrepresentations shall not reduce the book value of Wilson's stock below $13.50 per share as above set forth, then Crawfords shall not be liable therefor.
 
 
 17
 For the purpose of this section, breach of warranty or misrepresentation shall include, but shall not be limited to, the following:
 
 
 18
 (a) The existence of a claim against, or liability of, company or subsidiaries of any nature, whether accrued, absolute, contingent or otherwise, arising out of facts existing on October 31, 1973 and not reflected in or reserved against in the Financial Statements, or any claim against or liability of Company or Subsidiaries incurred between October 31, 1973 and the closing, other than in the normal course of business, including without limitation, any tax liabilities on transactions entered into or facts existing prior to closing;
 
 
 19
 (b) The diminution in value of any real estate or personal property caused by or due to a defect in title or claims by third parties;
 
 
 20
 (c) Any expenses in connection with the foregoing, including attorney's and accountant's fees incurred in connection therewith and the expense of defending or settling any claim against Company, its subsidiaries or their properties;
 
 
 21
 This section shall apply to any breach of warranty or misrepresentation notice of which was given to Stockholder within three (3) years from the date of closing, regardless of the date of final settlement or determination.
 
 
 22
 The Corporation joins in many of Wilson's arguments and also contends that Crawford was guilty of fraud, misrepresentation and breach of fiduciary duty. These latter claims arise from actions of Crawford between the time of the execution of the agreement with Wilson and the closing of the Wilson transaction. During that period Crawford was in control of the Corporation. He signed minutes of a directors' meeting held on April 12, 1974 which contained a statement that the book value of the stock of the Corporation was $13.59 per share and which approved the tender offer for two-thirds of the stock of each shareholder at $13.74 per share ($14 less Covington Funding's fee) as a fair price for the stock. The Corporation contends that if the latest financial figures of the Corporation, as of December 31, 1973, had been prepared according to generally accepted accounting principles (GAAP) the book value per share would have been substantially less than $13.59. Further, it asserts that Crawford failed to disclose information concerning several transactions which, if known, would have lowered the fair price per share of the tender offer.
 
 II.
 A.
 
 23
 By interlocutory orders the district court granted summary judgment to Crawford on the Corporation's claims under federal securities laws and the Tennessee "blue sky law," and on Wilson's claims under the Tennessee statute. These rulings were based on Tennessee statutes of limitation. The court held, however, that none of the various claims for common law fraud interposed by both Wilson and the Corporation or Wilson's claims against Crawford under the federal securities laws were barred by limitations.
 
 B.
 
 24
 The district court's final decision is contained in a lengthy memorandum which summarized the course of dealing between the various parties to the consolidated actions and the relief sought in each of the actions. The holding on which the judgment was primarily based involved Wilson's right of setoff for breach of warranty. Wilson's claim of a right to set-off was based on the contention that certain transactions by the Corporation were not properly treated in the financial statements of December 31, 1973. Wilson contended that if the "R-22 (or Arcroft)" and the "D'Arco and Kelly" sales transactions "had been recorded in accordance with generally accepted accounting principles the book value of the Corporation's stock would have been substantially less than $13.50 per share." The district court found that if these transactions were viewed as of the time of closing, they would support the book value shown on the December 31, 1973 financial statements. The court held, since "under the contract they (Crawford) were entitled to have taken into account, in determining the book value on December 31, what happened to the R-22 property and the D'Arco and Kelly property after December 31, and prior to closing on May 7, 1974, we need not decide whether the handling of these properties in the December 31, financials was in accordance with generally accepted accounting principles."
 
 
 25
 The district court reached this conclusion upon finding ambiguity in the agreement and then determining from the actions of the parties that "the parties, including Wilson, did not construe the contract as providing that the sellers were not entitled to the benefit of these sales prior to closing in support of the book value as shown on the December 31, 1973 financials." The "actions of the parties" referred to by the court were identified in the memorandum as the failure of Wilson and his advisors to protest at closing, or when the Corporation's books were turned over to them, even though they knew by this time that the R-22 property had been taken back prior to December 31, 1973 and that the D'Arco and Kelly transaction had been "restructured" between that date and the time of closing. Further, though the accountants employed by the Corporation after Wilson took control determined in November 1974 that the R-22 and D'Arco and Kelly transactions had to be restated, no claim of breach of warranty was made until April 5, 1977. Thus the district court denied Wilson any right of set-off for breach of warranty. The court wrote, "We construe the contract to provide that the R-22 transaction and the D'Arco and Kelly transaction may be viewed as of the date of closing for purposes of determining whether the book values of these properties were fairly reflected in the December 31, 1973 financials."
 
 C.
 
 26
 The district court did grant Wilson set-offs for failure of the Corporation while still controlled by Crawford to provide for a partial bad debt with respect to a transaction referred to as "ARC Developers" and for certain state and federal taxes. The court denied the claim of Crawford and the other sellers that they were entitled to credit for a tax refund received by the Corporation after the closing, as the result of taxes paid before December 31, 1973 and not shown on the financial statement of that date as a receivable.
 
 D.
 
 27
 The district court also denied Wilson's claims based on common law fraud and violations of federal securities laws. The court found an absence of "scienter," which must be present for recovery under either of these claims. The court also found that Wilson did not rely on the estimates of value contained in Crawford's September 12, 1973 letter, a further bar to recovery. Since the stock purchase agreements of Hornbeak and Kimball were identical to that of Crawford, the final judgment in each of the actions against Wilson also reflected the holdings herein outlined with respect to breaches of warranty and set-off. Covington Funding Co. received notes from Wilson for its fee for structuring the sale of the Corporation and the judgment denied Wilson's claim of set-off against these notes as well.
 
 E.
 
 28
 The district court also dismissed the Corporation's action against Crawford for common law fraud, violation of federal securities law and breach of fiduciary duty. The court found that at the time of the April 12, 1974 directors' meeting and when the tender offer was made "the book value of the stock of Crawford Corporation was substantially as much as stated in the minutes and therefore Crawford committed no fraud or breach of fiduciary duty in making such statement in the minutes and in approving the tender offer."Wilson and the Corporation have appealed and the other parties have cross-appealed from the portion of the judgment which allowed partial set-offs.
 
 III.
 A.
 
 29
 The principal issue in this case is a factual one--the meaning of the warranty and set-off provisions of the stock purchase agreement. In this case which was tried without a jury our standard of review is that prescribed by Rule 52(a), F.R.Civ.P.: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."
 
 
 30
 We agree with the district court that the stock purchase agreement is ambiguous with respect to the critical time at which book value is to be determined. In part 4 of the agreement it is stated that the book value of all stock purchased by Wilson under the agreement shall be not less than $13.50 per share. Since this statement is contained in the portion of the agreement which deals with conditions subsequent to closing it appears to relate to the value following completion of redemption of up to two-thirds of the outstanding stock pursuant to the tender offer. This construction is supported by a letter from Wilson to Crawford, the other sellers of stock and Gittlin of Covington Funding Co., dated April 5, 1977, where Wilson wrote:
 
 
 31
 I specifically call your attention to the provisions of the contract in which you warranted to me that the book value of all the stock which I purchased from you, after completion of the tender offer, would not be less than $13.50 per share.
 
 
 32
 In part 5 of the agreement Crawford clearly warranted that the December 31, 1973 financial statements of the Corporation which reflected a book value of $13.59 per share were "substantially true, complete and correct and were prepared in accordance with generally accepted accounting principles, consistently applied," and fairly represented the financial status of the Corporation. If this description of the financial statements was not true, there was a breach of warranty. However, the district court found it unnecessary to determine whether this warranty was breached because of the limitation contained in part 11 on the right of Wilson to enforce a set-off. That portion of the contract gives Wilson the right to set-off against any unpaid balance of the purchase price an amount equal to the difference between $13.50 per share and the diminished value per share resulting from the cumulative effect of all breaches of warranty or misrepresentations contained in the agreement, "either on the date of execution hereof or the date of closing." This right is specifically limited, however, by the language which immediately follows:
 
 
 33
 In event the cumulative or combined effect of all such breaches of warranty and misrepresentations shall not reduce the book value of Wilson's stock below $13.50 per share as above set forth, the Crawfords shall not be liable therefor.
 
 
 34
 The district court concluded that the parties had construed the agreement to mean that if the book value of the stock purchased by Wilson equalled or exceeded $13.50 per share at closing, the cumulative or combined effect of any misrepresentations would be held not to have reduced the book value, and thus there would be no right of set-off. The district court found that it was undisputed that the book value exceeded $13.50 per share at the time of closing. The only evidence on this point is the testimony of an accountant for the Corporation who was called as a witness by Crawford. This witness testified that the book value of the stock on the date of closing was $13.67 per share. This witness was a member of the accounting firm which had agreed to a restatement of the December 31, 1973 financial statement required by the firm hired by the Corporation after Wilson took control. This restatement had resulted in a reduction of book value below the $13.59 per share figure warranted by Crawford. The effect of this testimony was that, since the book value remained above $13.50 per share at the time of closing, the combined or cumulative effect of any breaches had not been to diminish it to a point where a set-off would be available.
 
 B.
 
 35
 Wilson argues that the district court made two fundamental errors in its treatment of his claim of set-off: it misconstrued "cumulative or combined effect" of breaches of warranty and it treated the date of closing rather than December 31, 1973 as the "financial instant" for the transaction. These errors, he asserts, led the court to conclude erroneously that it was not required to determine whether the December 31, 1973 financial statements were as warranted. Wilson contends that if the application of GAAP to the December 31, 1973 financial statements would result in a book value as of that date of less than $13.50 per share he is entitled to a set-off, regardless of book value on the day of closing. The agreement was based on a book value of $13.50 per share on December 31, 1973, and he was entitled to receive the benefit of any appreciation thereafter, Wilson maintains. Thus, he argues, the "cumulative or combined effect" refers only to the net result of any breaches of warranty on the December 31, 1973 value, and not to the net result of such breaches and of other events or transactions which increased book value. The district court erred, he claims, in considering the net effect of all transactions which changed book value either up or down between December 31, 1973 and the date of closing and then making book value on the latter date determinative of whether Wilson was entitled to a set-off.
 
 C.
 
 36
 The agreement speaks of a breach of warranty "either on the date of execution hereof (April 10, 1974) or the date of closing (May 7, 1974)." On November 26, 1973, after Wilson had agreed to buy Crawford's stock at $14 per share but before the details had been set out in a contract, Wilson wrote Crawford, "You will agree when this trade is consummated the book value of the Crawford Corporation will be a minimum of $14.00 per share." (Emphasis added). This figure was changed to $13.50 in the final agreement. The warranty in part 5 of the agreement does not refer only to the condition of the Corporation as of December 31, 1973. It also warrants that no undisclosed contracts, obligations or other liabilities will alter the financial conditions of the Corporation substantially. This warranty appears to refer to the future--to events between December 31, 1973 and some later date. The next paragraph appears to fix that later date as the date of closing.
 
 
 37
 Since December 31, 1973, there have not been, and prior to closing there will not be any material changes in the financial position or assets ..., except changes in the ordinary course of business and there have not been and shall not be prior to closing any payment of dividends ....
 
 
 38
 (Emphasis added).
 
 
 39
 The book value per share of the stock of the Corporation as of December 31, 1973 was undoubtedly the bench mark which became the basis of agreement on price between Crawford and Wilson. Wilson was willing to pay a small premium above book value, but prudently required a guarantee that the value would still be there when the transaction was completed. He received this protection in the provision which allowed him a set-off in the event the December 31, 1973 financial statements should not be accurate and the cumulative effect of any breaches and misrepresentations prior to closing should be to reduce the net worth of the Corporation below the agreed figure. On the other hand, Crawford knew that some of the entries on the December 31, 1973 financial statements had been questioned (R-22) and that there were problems with one of the transactions (D'Arco and Kelly) which was still in the process of completion. The provision limiting the right of set-off only to a situation where the cumulative or combined effect of breaches or misrepresentations resulted in a reduction of the book value to a figure below $13.50 per share protected him from being penalized for a breach which resulted in no damage to Wilson. We can find no other explanation for this provision in the contract, and Wilson had supplied none.
 
 
 40
 The language of the agreement prohibits consideration of breaches individually. Only when their combined effect reduces book value below $13.50 per share do the breaches have any significance. Determination of whether or not breaches occurred is controlled by whether, if known, they would have changed the December 31, 1973 financial statements substantially. However, determination of whether breaches provide relief in the form of a set-off depends on their combined or cumulative effect on the book value at the time of closing. So long as Wilson received the value he bargained for, stock with a book value of at least $13.50 per share, he was not damaged by the fact that its value may have been overstated in the earlier financial statements which provided one of the bases for his agreement to pay $14.00 per share.
 
 
 41
 The district court's construction is reasonable and its finding of the intent of the parties is not clearly erroneous. Wilson stated in at least two letters that Crawford was to warrant the value as of the time of completion of the deal.[1] This indicates that he construed the agreement to warrant that the value stated as of December 31, 1973 would still be there when he paid Crawford for the stock. Furthermore, the district court made a finding, contrary to Wilson's testimony, that Wilson did not raise the issue of his claim of set-off at a meeting with Crawford in December 1976. This was long after Wilson had all the information concerning the R-22 and D'Arco and Kelly transactions. Wilson had three years after the closing in which to make a claim of set-off. Thus his failure to raise the issue sooner was not viewed by the district court as a waiver. Rather, in combination with other conduct and writings, this was seen as an indication that Wilson construed the warranty and set-off provisions as providing relief only in the event of Wilson's failing to receive stock with a book value of at least $13.50 per share from Crawford.
 
 
 42
 Wilson's argument that the parties intended him to reap the benefit of increases in the Corporation's worth does not require a different result. One reason for his interest in the Corporation appears to have been its potential for disposing of some of its assets at prices above their historic book values. It was anticipated that some of these increases would be realized between December 31, 1973 and the date of closing. The proceeds of sales during that period were used to finance the tender offer by which Wilson became the virtual owner of the Corporation with a very small cash outlay. It was only when the Corporation suffered a "total disaster" from an unrelated purchase and Crawford refused to extend the maturity dates of the Wilson notes that Wilson claimed a breach of warranty related to the R-22 and D'Arco and Kelly transactions.
 
 
 43
 There is some support in the record for Wilson's position that he was entitled to a set-off if the true book value of the stock on December 31, 1973 was less than $13.50 per share regardless of the effect of other adjustments to value between that date and the date of closing. However, the construction of an ambiguous contract requires a factual determination, and our review of the findings of the district court is controlled by the "clearly erroneous" standard. This is not a case where this court "on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). Thus the district court's denial of the right to set-off under the agreement affords no basis for reversal.
 
 IV.
 A.
 
 44
 We find no error in the district court's denial of Wilson's claims based on common law fraud with respect to the September 12, 1973 letter and violations of federal securities law. Notwithstanding Wilson's reading to the contrary, the district court did make a finding that there was no scienter proven. The court did not base its ruling on a lack of reliance alone as claimed by Wilson. The question of scienter is one of fact, and this finding by the district court is not clearly erroneous. Further, there is substantial evidence in the record to support the district court's finding that Wilson, an extremely experienced real estate developer and trader who viewed some of the Corporation's property himself and sent his representative to investigate the holdings on at least two occasions, did not rely on Crawford's representations and projections of values. The district court properly applied the holdings of Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), and Edwards v. Travelers Insurance, 563 F.2d 105, 111 (6th Cir.1977), to the claims for fraud and misrepresentation.
 
 B.
 
 45
 The Corporation sought a set-off with respect to notes which it gave Crawford for the remaining two-thirds of his stock which was purchased pursuant to the tender offer. The district court found that Crawford was not guilty of fraud either under the common law of Tennessee or federal securities law in signing minutes which stated that the book value of the stock of the Corporation was $13.59 per share. There were no warranties from Crawford to the Corporation, so that issue is not involved in the Corporation's appeal. The district court made a finding of fact that at the time of the directors' meeting the book value of the stock was "substantially as much as stated in the minutes ...." This finding is not clearly erroneous and it supports the district court's conclusion that Crawford was not guilty of fraud. It also supports the court's conclusion that Crawford was not guilty of a breach of fiduciary duty in this respect. If the value was as stated, Crawford as controlling party committed no wrong in approving the tender offer at $14 per share as he and Wilson had earlier agreed it would be made.
 
 
 46
 The Corporation makes much of the district court's observation that its claims had not been presented by Wilson in a shareholders' derivative action. This was nothing more than an observation; the district court did not deny relief because of the form of action. The court did comment that it was difficult to conceptualize any damage to the Corporation from setting the price too high in a tender offer to its own shareholders. Since all shareholders had the same opportunity to tender shares, any diminution in net worth of the Corporation resulting from payments for tendered shares would be precisely the amounts paid on a proportionate basis to the shareholders. Since no non-tendering shareholder had complained, the district court found no right in the Corporation to rely on this claim. All of this discussion by the district court was dictum, however. The holding was that the Corporation had failed to prove a breach of fiduciary duty because the book value was substantially as stated in the minutes.
 
 C.
 
 47
 The district court did not directly address one of the claims of the Corporation.
 
 
 48
 In its Second Amendment to Amended Complaint the Corporation charged Crawford with breach of fiduciary duty in the restructuring of the D'Arco and Kelly transaction. Though the district court found no breach of fiduciary duty by Crawford in approving the minutes of the directors' meeting it did not address the claim raised in the second amendment. On remand the district court will make findings with respect to the claim which is distinct from those covered in its memorandum.
 
 V.
 
 49
 Turning to the cross-appeal of Crawford and the other noteholders, we believe the district court acted inconsistently in allowing partial set-offs. Upon finding that the per share book value of the stock exceeded $13.50 at the time of closing the district court necessarily found that the cumulative or combined effect of all breaches by Crawford had failed to reduce that value sufficiently to support set-offs. Yet the district court found three separate failures to follow GAAP and allowed a pro rata set-off of the amount by which each of these errors resulted in an overstatement of book value on the December 31, 1973 financial statements. It was error to consider these items separately. Under the agreement no set-off was permitted unless the cumulative effect of all breaches had the effect of reducing book value below $13.50 per share. The finding that book value was not so reduced precluded any allowance of the set-off claims.
 
 VI.
 
 50
 Both Wilson and the Corporation contend that the district court erred in denying their untimely motions for a jury trial. Such motions are addressed to the sound discretion of the trial judge. The record discloses that the trial judge carefully considered the motions and concluded there was reason to deny them. These consolidated cases involved a great deal of testimony concerning property values, accounting procedures and other complicated evidence. We find no abuse of discretion in the denial of the motion in this case. See Hyde Properties v. McCoy, 507 F.2d 301, 306 (6th Cir.1974).
 
 
 51
 The judgment of the district court is affirmed in part, vacated in part and reversed in part. The cause is remanded for consideration by the district court of the issues identified in part IV-C of this opinion. It is affirmed as to all other issues raised on direct appeal. The judgment is reversed on cross-appeal and remanded for deletion of the set-offs allowed on the basis of breaches of warranty. No costs are allowed on appeal.
 
 
 
 *
 The Honorable Carl Rubin, Chief Judge, U.S. District Court for the Southern District of Ohio, sitting by designation
 
 
 *
 And liabilities shall not have been increased in an aggregate amount in excess of $100,000.00 excluding income tax liabilities on completed real estate sales and excluding any promissory notes to Crawfords as contemplated herein
 
 
 [1]
 At one time Wilson contended he was entitled to a set-off based on the value of the stock after the tender was completed. However, he did not pursue this claim, and the issue actually tried was whether the court should consider value on the closing date or only as of December 31, 1973